## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NORTH DAKOTA

United States of America,     )
          )
        Plaintiff,    )     Case No. 2:15-cr-55
          )
   vs.         )  **REPORT AND RECOMMENDATION**
          )    **ON MOTION TO SUPPRESS**
Daniel Vivas Ceron,    )
          )
        Defendant.   )

Daniel Vivas Ceron moves to suppress statements he made to law enforcement agents on July 17, 2015, contending his statements were not voluntary within the meaning of <u>Miranda v. Arizona</u>, 384 U.S. 436 (1966). At the request of the presiding judge, this court held an evidentiary hearing on Ceron's motion on April 16, 2019.[1]

Ceron is charged with conspiracy to distribute fentanyl resulting in serious injuries to multiple people, and resulting in multiple deaths. The criminal activity is alleged to have occurred while Ceron was serving a sentence at a Canadian prison. After he had completed the Canadian criminal sentence, Ceron was to be deported from Canada to his native country—Colombia. On July 17, 2015, Canadian officers escorted Ceron on a commercial flight originating from Montreal, Quebec, Canada, which Ceron understood was bound for Bogotá, Colombia.

But, in the months prior to July 2015, agents of the United States Department of Homeland Security-Homeland Security Investigations (HSI) made arrangements with law enforcement agencies in Canada and Panama, so that Ceron would be transferred to

---

[1] In addition to the court reporter's record, a digital recording of the hearing is available through the court's computer system.

Panamanian custody when the plane had a layover at Tocumen International Airport (TIA), in Panama City, Panama. During the layover, Canadian officers escorted Ceron off the plane and into the airport terminal. Inside the terminal, Panamanian police officers took custody of Ceron pursuant to a provisional arrest warrant based on the Indictment in this case.

After he was transferred to Panamanian custody, Ceron was taken to a secure room in the airport terminal where he was questioned by an agent of the United States Drug Enforcement Agency (DEA) and an agent of HSI. Ceron's motion asserts his statements to those agents were not made voluntarily, contending he was "coerced, threatened and intimidated into waiving his rights and speaking with agents." (Doc. 63, p. 2).

At the suppression hearing, the United States presented testimony of four law enforcement agents: (1) DEA Agent Michael Buemi, who interrogated Ceron at TIA; (2) HSI Agent Brian Black, who was present in the room throughout Agent Buemi's interrogation of Ceron and who took notes and prepared a report of the interrogation; (3) Corporal Dany Turcot of the Royal Canadian Mounted Police (RCMP), who questioned Ceron's girlfriend—Marie Um—in Montreal at the same time Ceron was being interrogated at TIA[2]; and (4) HSI Agent Jeremy Grube, the case agent, who was present in Montreal and observed Corporal Turcot's interview of Um.

_____

[2] Corporal Turcot testified via video from Montreal. At the hearing, Ceron, through counsel, verified he did not object to use of video for the testimony. In a pro se motion, Ceron refers to Corporal Turcot not having sworn before a Canadian court, asserting no action could therefore be taken against Corporal Turcot if he lied under oath. (Doc. 93, p. 2).

Several documents were received in evidence at the hearing—two Advice of Rights forms, (Doc. 90-1), and two reports prepared by Agent Black, (Doc. 90-2; Doc. 90-3). Following the hearing, the parties stipulated to admission of additional documents: a recording and transcript of a portion of a phone call that took place during the course of the interrogation, emails and reports concerning the recording of that phone call, and post-hearing emails from agents of the Canadian Border Services Agency (CBSA). (Doc. 90-4 to -7).

Subsequent to the suppression hearing, Ceron filed two pro se motions. One is captioned Request to Subpoena Witness and Evidence on My Behalf for Motion to Suppress Statement, (Doc. 93) (spelling and capitalization altered), and the other is captioned Motion to Sup[p]ress Statement Request for Court to Intervene, (Doc. 94). To the extent the pro se motions assert Ceron's interpretation of the evidence, the pro se motions are incorporated into the Law and Discussion section below.

**Summary of Evidence**

**1.    Ceron's Sworn Statement**

In connection with an earlier motion to dismiss the Indictment, Ceron submitted a lengthy sworn statement. (Doc. 60-1). The following is a summary of that portion of the sworn statement which pertains to the issues presented in this motion.

Ceron states it was "clear in [his] mind" that he "best never set foot in Panama" because of his previous experience with the Panamanian criminal justice system. Id. at 5. He states that, prior to July 17, 2015, Canadian immigration officials and his Canadian parole officer repeatedly told him the flight path for his deportation would be direct from Montreal to Bogotá, and that he would arrive in Bogotá at 3:20 p.m. local

3

time the same day. Id. at 9, 13. He also states he was told there were no foreign warrants on file for him. Id. at 10.

CBSA agents escorted Ceron on the flight. According to his statement, after the plane departed Montreal, one of the CBSA agents told Ceron the plane would be landing at TIA but the stop was only for refueling. Id. at 16. Ceron states that, after the plane landed at TIA and the other passengers had exited the plane, one of the CBSA agents told him he needed to exit the plane because Panamanian police "wanted to have a word with [him]" in regard to the reason for his deportation from Canada. Id.

As to whether he cooperated in exiting the plane and walking into the TIA terminal, Ceron's statement is somewhat contradictory: he implies he did not physically resist the agents' directions, id. at 17, but also refers to being forced off the plane, id. at 110. He states he had a well-founded fear of being in Panama because of his past experience in that country. Id. at 14-15. He asserts he was transported on a commercial flight, rather than a government plane, because the presence of civilian passengers would act as a "human shield" to persuade him not to fight getting off the plane in Panama. Id. at 139.

Ceron describes that, after he was escorted inside the TIA terminal, he was taken to a room which was "immediately" filled with thirteen to fourteen people. Id. at 18. In his sworn statement, Ceron included a drawing of the layout of the room where he was taken, which identified positions of the various law enforcement agents inside the room. He states the Panamanian police officers in the room were armed with guns and wooden batons, held "as if they [were] ready to beat [him]." Id. He states he was never formally arrested. Id. at 19.

Ceron states Agents Buemi and Black introduced themselves but the other law enforcement agents did not do so. Id. at 19. Ceron states only Agents Buemi and Black spoke to him and they spoke to him only in English. Id. Further, Ceron wrote the agents told him they "had people" standing by his mother at the Bogotá airport, had his girlfriend in a room in Canada, and had people standing by his girlfriend's family. Id. at 20. He states he was told that, if he did not plead guilty to "whatever [the agents] say," his family would suffer severe physical harm or death. Id. Ceron describes his perception of the body language of the various law enforcement officers as a "hostage taking situation" in which he was to trade his life and freedom for the safety and lives of his family. Id. at 21. He states Agent Buemi showed him a video of Um, sitting in a room, in a "hostage taking situation." Id.

Ceron states he told Agent Buemi, "Okay, I'm guilty of what ever you say, just don't hurt my family," and after he said that, everyone in the room relaxed and the Panamanian police officers lowered their "sticks to the ground." Id. at 22. Ceron states, "the entire torture, hostage taking negotiation lasted 10 minutes I'm pretty sure, every thing went fast." Id. at 28. Although not clear from the statement, it appears Ceron's reference to the "hostage taking negotiation last[ing] ten minutes" refers to the time between entering the secure room and his statement that he was "guilty of what ever you say."

Ceron's statement implies it was not until after he said he was "guilty of what ever you say" that Agent Black gave him a "waiver type form" and told him to sign it, id. at 26, though later in his statement Ceron states his rights were never read to him, id. at 214. He states that he did not read all of the form at the time. Ceron states he signed the

form because he was still under the threat of harm to his family, "but a small note in French gave understanding on which grounds" he signed the form. Id. at 26. The meaning of his reference to a "small note in French" is not clear; there is no note in the French language on the form Ceron signed.

According to Ceron's statement, as Agent Buemi began to question him, Canadian officials removed their handcuffs from him, and Agent Buemi put his handcuffs on him. Id. at 23. He describes that, after the handcuff exchange, he was brought to a second room and seated in a chair in the middle of that room. He describes the second room as dark, with the only light coming from a large window, but describes it as being "bright outside." Id. at 24.

Ceron describes requesting, and the agents arranging, a phone call between Ceron and Um. Id. He states that soon after he asked the agents if he could speak with Um, Agent Buemi passed his phone to him and Um was on the line. He states he told Um he would "make [him]self guilty" so she would not be hurt. Id. Ceron describes only Agent Buemi being in the room while he spoke with Um. Id. In the first pro se motion, Ceron refers to a recording of his conversation with Um having been "retouch[ed] and cut."[3] (Doc. 93, p. 1).

Ceron states that, at some point during the interrogation, a Canadian man came into the room, Agent Buemi asked Ceron if he wanted to speak with a lawyer, and Agent Buemi told Ceron the Canadian man was a lawyer. (Doc. 60-1, p. 24). Ceron states that, though he did not realize it at the time, he later realized the man Agent Buemi said was a

---

[3] As discussed later in this opinion, the recording in evidence is of only a portion of the Um/Ceron phone conversation.

lawyer was actually a Canadian police officer who had been involved in Ceron's Canadian criminal case and who was present at TIA to identify Ceron. Id. at 25.

The same day Ceron was interrogated at TIA, his mother, Maria Elena Ceron Escobar, was interviewed at the Bogotá airport by U.S. law enforcement agents. Id. at 52. In his sworn statement, Ceron states his mother has told him two individuals who identified themselves as United States agents approached her at the Bogotá airport, told her he had been arrested in Panama for U.S. drug charges, and questioned her about "money and crim[inal] activity." Id.

Ceron states the "U.S. embassy was typing really fast" on a smart phone during the interrogation and a couple of Panamanian police officers may have also had smart phones. Id. at 21. He states there were "videos, notes, U.S. Embassy communiques, or recordings" of the July 17, 2015 events at TIA. Id. at 26.

Ceron states he asked the DEA and HSI agents if they were coming for him soon and was told it would be two weeks, which "actually became 18 months." Id. at 30. After the interrogation was completed, Ceron describes the Panamanian police grabbing him and taking him out of the TIA terminal. Id. at 29. Ceron describes the Panamanian police officers having "pull[ed] on [his personal] property like crabs on dead fish." Id.

Ceron was transported from Panama to the United States in January, 2017. Id. at 56. In his sworn statement he states it was not until the date he was transported to this country that he was "registered to be in Panama by customs" and that his passport was never stamped to indicate he had entered Panama on July 17, 2015. Id. at 57.

The rest of Ceron's sworn statement describes the conditions in the Panamanian jail in which he was held, his appearances in Panamanian courts in connection with his

extradition, and his position that the process of his extradition did not comport with international law.

## 2.    Law Enforcement Agents' Testimony

Agents Black, Buemi, and Grube testified that HSI, through its Panama Transnational Criminal Investigative Unit, coordinated advance arrangements for Ceron's interrogation in Panama. Agent Black testified coordination meetings in the months prior to July 2015 involved HSI, DEA, RCMP, and Panamanian authorities. All three U.S. agents testified they were told during the coordination meetings that Panamanian law prohibited recording of the interrogation. Agent Grube testified they were advised Article 29 of Panama's constitution prohibited recording,[4] unless a search warrant was obtained prior to an arrest. The agents also testified that, when advance arrangements were made, Panamanian authorities advised they generally did not work after 5:00 p.m. on Fridays.

Agent Black testified he and other agents traditionally did not "fly armed" to any foreign country, and both he and Agent Buemi testified they had no firearms with them while in Panama. Agent Grube testified he was told that agents could bring firearms to Panama if they came on a government plane and if the firearms were secured while they were in Panama, but that agents absolutely could not have firearms with them outside the airplane.

Agents Black and Buemi both testified that they were waiting for Ceron at a

---

[4] Article 29 of the Constitution of Panama provides, "All private communications are inviolable and may not be intercepted or recorded unless authorized by judicial warrant."

passenger gate in the TIA terminal and that Ceron was the last passenger to exit the plane. Both testified that Ceron's transfer from Canadian to Panamanian custody was marked by the Canadian officers removing their handcuffs from him and the Panamanian police officers placing their handcuffs on him, in the front. Agent Black's supplemental report states three Panamanian police officers were present during Ceron's arrest and none of them wore firearms in the TIA terminal. (Doc. 90-3, p. 2). Agent Black testified there was a photograph taken of Ceron soon after he exited the plane, but there are no photographs in evidence.

### A.     Interrogation Environment

Agents Black and Buemi described the area where Ceron's interrogation took place: an anteroom, approximately ten by twelve feet, with a smaller adjoining room where the interrogation took place. Agent Black described the smaller room as well-lit with a large exterior window. A door to the larger anteroom was left open during the interrogation because there was not air conditioning in the smaller room. Agent Black testified there were "about five" other law enforcement agents in the anteroom during the interrogation.

Two chairs faced each other inside the smaller room. Agent Buemi sat in one chair, and Ceron sat in the other. Agent Buemi said there was a "comfortable space" between him and Ceron. Ceron faced the window, across from Agent Buemi. Agent Black stood between Agent Buemi and the window and took notes during the interview. Agents Black and Buemi testified the questioning of Ceron began at approximately 2:50 p.m., Eastern Time, thirty to forty minutes after the plane on which Ceron arrived landed at TIA.

Agents Black and Buemi both testified they were unarmed during the interrogation. Both agents also testified they saw none of the Canadian or Panamanian police officers in possession of any firearms, batons, or other implements of force. Agent Black testified he did not see any of the Panamanian police officers wearing duty belts. Agent Buemi testified he and Agent Black wore "laid back" clothing during the interrogation.

### B.    <u>Miranda</u> Warning

Agent Black testified he and Agent Buemi showed Ceron their credentials after they entered the smaller room. Agent Black testified Ceron had wanted to talk to the agents even before he was given a <u>Miranda</u> warning, but Agent Black and Agent Buemi told him they could not talk with him until they explained his rights to him.

Agent Buemi testified that he read the <u>Miranda</u> warning to Ceron in the English language after they entered the smaller room, that he presented Ceron with two written Advice of Rights forms—one in English and one in Spanish—and that he allowed Ceron to read both forms himself. Ceron initialed each item on the Spanish language form, and he and Agent Buemi signed the Spanish language form. Agent Buemi indicated on the form that it was signed at 2:50 p.m. (Doc. 90-1).

Agent Black testified that, while the <u>Miranda</u> warning was being read to him, Ceron asked about getting a lawyer and that he was told a lawyer could not be arranged in Panama but one could be arranged once he got to the United States. Agent Black testified Ceron did not actually say he wanted a lawyer but only asked about the process of getting a lawyer. Agent Black testified Ceron agreed to talk with him and Agent Buemi and "never said he didn't want to talk." Agent Black testified Ceron did not raise the

10

question of speaking with a lawyer at any point later in the interrogation. Agent Buemi testified he did not remember Ceron asking questions about getting a lawyer. Agent Buemi testified Ceron asked no other questions about his rights; both agents testified Ceron confirmed his understanding of his rights and stated he was willing to answer their questions.

### C.    Interview Process

Agent Black testified he and Agent Buemi advised Ceron of the charges in the Indictment after giving Ceron the <u>Miranda</u> warning. Agent Black described Ceron as appearing curious, attentive, cordial, agreeable, and very intelligent throughout the interrogation. He testified that Ceron answered questions without hesitancy, that Ceron was "eager to know what we knew" throughout the interrogation, and that Ceron did not decline to answer any questions during the interrogation. Agent Buemi described Ceron's demeanor as relaxed and observant.

During cross-examination, Agent Black testified he had his notes of the interrogation when he prepared his report five to seven days after the interrogation but he could no longer find those notes. He also testified he did not have the text messages he and Agent Grube had exchanged that day, since the text messages were not saved when the cell phone he had in Panama was replaced.

Agent Buemi conducted his questioning in English, which Agent Black testified was Ceron's stated preference. Agents Buemi and Black both testified that Ceron spoke fluent English throughout the interrogation and that he gave no indication of not understanding the English language at any point during the interrogation.

Agent Black testified that Ceron asked if the agents wanted him to "write a blank

check" but he did not know what Ceron meant by that statement and that they told him they just wanted the truth. Agent Black described Agent Buemi's interrogation as outlining the government's evidence to Ceron and seeking Ceron's confirmation of that evidence.

Agent Buemi testified he played a recorded conversation—between Ceron and an undercover agent—to Ceron early in the interrogation and Ceron asked whether it was Agent Buemi with whom he had spoken during that conversation. Agent Buemi testified he then presented Ceron with surveillance photographs of Ceron's girlfriend—Um— receiving packages containing drugs and photographs of Ceron's mother receiving packages containing payments for drugs. Agent Buemi testified he perceived that after he presented those photographs, Ceron began to speak more freely in response to his questions.

Agents Buemi and Black both testified Ceron confirmed evidence presented to him, including: (1) various online user names alleged to have been used in the course of fentanyl distribution, (2) other individuals' involvement in distribution of fentanyl, (3) Ceron's familiarity with types and forms of fentanyl, and (4) Ceron's purchase of fentanyl directly from China. Agent Black testified Ceron said the deaths and serious injuries charged in the Indictment had not resulted from "his product" because his product was not strong enough to cause the alleged overdoses. Agent Black testified Ceron talked about involvement of others in the distribution of fentanyl and acknowledged he had supplied fentanyl to several of those individuals. Agent Buemi testified Ceron's responses corroborated evidence compiled in the investigation and said Ceron's responses "filled in the gaps." Agents Buemi and Black testified the Panamanian

12

police officers stepped into the smaller room five or six times to check on progress of the interrogation but had no interaction with Ceron when they did so.

Agent Buemi testified he advised Ceron that his mother would be interviewed in Bogotá the same day. Agent Grube testified he asked an HSI agent in Bogotá to conduct a "consensual interview" of Ceron's mother at the Bogotá airport and described Ceron's mother as a "person of interest" in the case. An investigation report in the docket states HSI agents first had contact with Ceron's mother at 5:35 p.m. on July 17, 2015, though no time zone is indicated. (Doc. 80, p. 3). Agent Grube testified the HSI agents' contact with Ceron's mother did not occur until after the interrogation of Ceron had been completed. Agent Grube also testified he was informed the encounter between Ceron's mother and the HSI agents was "very cordial."

### D.   Ceron/Um Phone Call

Agent Black testified Ceron became very upset and agitated when presented with evidence about involvement of Um and Ceron's mother. Agent Black testified Ceron said that Um and his mother had no knowledge of the contents of the packages and that they "didn't know shit" about fentanyl distribution.

While Agents Black and Buemi were interrogating Ceron, Corporal Turcot, of the RCMP drug investigations unit, was interviewing Um in Montreal. Corporal Turcot testified he arrested Um the morning of July 17, 2015, and took her to RCMP headquarters, where he interviewed her. Corporal Turcot testified he had minimal involvement in the investigation of Um and limited information regarding the investigation of Ceron, prior to July 17, 2015.

Agent Grube was also in Montreal and observed Corporal Turcot's interview of

13

Um from a monitoring room. Agent Grube testified he knew Canadian authorities planned to make contact with at least five individuals alleged to be involved in the conspiracy that day and he felt it would be best that he be present in Montreal because of his extensive knowledge of the case.

Corporal Turcot testified that his interview of Um began at 1500 hours, or 3:00 p.m, that the interview was recorded via video and audio, that he was the only person in the interview room with Um, and that two U.S. agents were present in the monitoring room during the interview. Corporal Turcot testified Um was not handcuffed during the interview and was relaxed and cooperative during the interview but was unwilling to answer any questions about the investigation. He said that Um had spoken with a "duty lawyer" twice during the interview process at her request. Corporal Turcot testified he left the interview room a few times during the interview to consult with the U.S. agents who were in the monitoring room and the U.S. agents sometimes presented him with evidence he might use to question Um.

Corporal Turcot interviewed Um in French, a language which Agent Grube did not understand. Agent Grube testified that, although he did not understand the content of the interview, it appeared to him the interaction between Corporal Turcot and Um was cordial, that she was not handcuffed during the interview, and that she appeared to be communicative with Corporal Turcot. When Corporal Turcot came to the monitoring room during the Um interview, he reported to Agent Grube that Um was not answering questions related to the investigation.

Agent Grube testified he communicated with Agent Black via text message and phone while the Um interview was in progress and Agent Black reported to him that

14

Ceron was cooperating with the interrogation. Agents Grube and Black testified they then arranged a phone call between Ceron and Um, using Agent Grube's cell phone, in hopes it would prompt Um's cooperation. Agent Black testified the phone call was made "about halfway through" the Ceron interrogation but also estimated it was about 1 ½ hours after the interrogation began. Agent Buemi estimated the phone call was made about one hour after the interrogation began. A transcript of a partial recording of the call identifies the time of the call as 2:05 p.m., without any indication of time zone.

Agent Grube testified the call took place in a hallway outside the interview room, because cell service was poor inside the interview room. He testified HSI Agent Guy Gino, Corporal Turcot, and Um, were present with him in the hallway during the call. Agent Grube testified that Um's demeanor was "fine" during the call and that Ceron did most of the speaking during the call. Agent Black testified Ceron "teared up" during the phone conversation with Um but otherwise showed no signs of distress during the interview. Agent Buemi described Ceron as being "very emotional" during the phone call.

According to Agents Buemi and Black, Ceron and Um spoke via phone for five to fifteen minutes in the French language. Corporal Turcot testified the phone call between Ceron and Um occurred right after 5:00 p.m. Eastern Time and lasted four to five minutes. Corporal Turcot and Agent Grube listened to the Ceron/Um phone conversation via speaker phone. Agent Grube learned of the content of the conversation only through Corporal Turcot, since Agent Grube understood no French. Following the call, Corporal Turcot told Agent Grube that Ceron had directed Um to be cooperative. Corporal Turcot testified Um's demeanor during the phone call was relaxed and she

listened more than talked. Corporal Turcot testified Ceron gave Um instructions about what to say and what not to say, told Um to "tell them everything," and told her he would "put all the blame on himself." He testified that neither Ceron nor Um referred to having been threatened during the phone call. In the partial transcript of the Ceron/Um call now in evidence, Ceron referred to "giving a discharge" to Um and to his mother. The transcript shows Ceron told Um not to worry about him several times. Um told Ceron she was going to wait for her lawyer. (Doc. 90-5).

Corporal Turcot testified Um was no more cooperative after the Ceron/Um phone call than she had been before the call. Agent Grube testified Corporal Turcot reported to him that Um had not answered questions about the investigation after the phone call.

Corporal Turcot testified he did not know whether the phone conversation had been recorded. Corporal Turcot testified about notes he had taken about the phone call, which he wrote about two hours after the interview. Agent Grube testified he did not know whether he recorded the phone conversation. Agent Grube was cross-examined about an audio recording of the call having been sent to a law enforcement agent in Bogotá, Colombia, and Agent Grube testified he contacted HSI information technology staff prior to the suppression hearing to attempt to locate any recording but had not been able to locate any recording. After local media reported on the suppression hearing, Agent Gino—who was also present in Montreal—contacted Agent Grube, advised he had recorded a portion of the Ceron/Um conversation on his cell phone and had located that recording. The parties then contacted the court to request the record be left open for possible submission of a translated transcript of the recording. Pursuant to the parties' stipulation, that transcript is now in evidence as Exhibit 5. (Doc. 90-5).

Exhibit 5 confirms that the recording of the call was sent to agents who were interviewing Ceron's mother in Bogotá on the same day Ceron was interrogated.

### E.     Ceron's Luggage

The questioning of Ceron took place on a Friday afternoon. Agent Black testified Ceron's luggage was left with the Panamanian police officers in the anteroom until near the end of the interrogation when the officers brought it into the smaller room. Agent Black testified he interpreted the officers bringing the luggage into the smaller room as a signal that it was time to finish the interrogation, since  Panamanian police officers generally did not work after hours on Fridays.

Agent Black testified that after Ceron's luggage was brought into the smaller room, Ceron asked to retrieve some papers from his luggage. Agent Buemi testified Ceron asked to look at the papers so that he could provide more detail about accounts and phone numbers used in the alleged conspiracy. Because Ceron was handcuffed, Agent Buemi assisted him in opening his luggage. Agent Black described Ceron retrieving a list of user names from his luggage and explaining those user names to the agents "without prompting." Agent Black said the papers were the same as those seized from Ceron's Canadian prison cell on June 3, 2015. Agent Buemi testified the Panamanian police officers ended the interrogation time while he was still reviewing Ceron's papers with him and Ceron's papers were then returned to him.

### F.     Conclusion of Interrogation

Agents Black and Buemi testified the interrogation of Ceron ended at approximately 4:45 p.m., a little less than two hours after it began. Agent Black testified of his impression that Ceron "wanted to keep talking" at the time the interrogation

ended. He also testified Ceron wanted to come to the United States with the agents at the end of the interrogation. Agent Buemi testified it was his impression at the end of the interrogation that Ceron would continue to cooperate. Agent Black said that, after the interrogation ended, Ceron volunteered that he preferred to buy fentanyl from China over heroin from the Middle East because he did not want to "fund the Arabs" and it was better for the money go to China rather than to the Middle East.

Agents Black and Buemi testified that they made no threats or promises to Ceron at any time during the interrogation, that no physical force was used against him, and that there had been no threats made toward Um or Ceron's mother at any point during Ceron's interrogation. Agent Black testified no voices were raised, there was no shouting during the interrogation, and the only time Ceron exhibited any heightened emotion was during his phone conversation with Um. Agent Buemi testified he witnessed no threats made to Ceron by any of the Canadian or Panamanian law enforcement personnel.

Post-hearing evidence included translations of emails from two CBSA agents who escorted Ceron from Montreal to TIA. One agent stated he was not made aware of any threats or acts of violence toward Ceron during Ceron's transit in Panama, and the other agent stated she did not witness or hear any threats made toward Ceron during his transit in Panama. (Doc. 90-6, p. 5).

### G.    Ceron's Transfer to United States

Ceron contested his deportation in the Panamanian courts. In January 2017, Agents Buemi and Grube and another DEA agent transported Ceron from Panama to North Dakota via a DEA plane. Agent Buemi testified Panamanian authorities brought

Ceron to the airport and transferred Ceron to custody of the United States. Agent Grube testified he completed transfer paperwork required by the Panamanian authorities, and the agents and Ceron then boarded the plane. Agent Grube testified he advised Ceron of the Indictment and of his rights after they boarded the plane, before the plane took off, and advised Ceron that they did not want to talk with him about the case at that time. He testified that Ceron said nothing about the TIA interrogation during the flight.

Agents Buemi and Grube testified Ceron was polite throughout the seven to eight hour flight from Panama to North Dakota. The plane stopped in Texas for approximately thirty minutes, to complete "parole paperwork" and entry paperwork. The agents allowed Ceron a restroom break and provided a meal for him during the stop in Texas. Agent Grube testified Ceron engaged in "general conversation" with them during the flight. Agent Buemi said he purposely did not talk with Ceron about the case during the flight. Both agents testified Ceron asked "what it would look like to cooperate." Agents Grube and Buemi testified Ceron mentioned nothing about any threats made during the July 2015 interrogation during the January 2017 flight. Agent Grube also testified it was his impression that Ceron would cooperate in the investigation when they arrived in North Dakota.

### Law and Discussion

The government bears the burden to show knowing, intelligent, and voluntary waiver of rights under Miranda. Berghuis v. Thompkins, 560 U.S. 370, 383-84 (2010).

"The Fifth Amendment guarantees that no person shall be compelled to give evidence against himself, and so is violated whenever a truly coerced confession is introduced at trial." Kansas v. Ventris, 556 U.S. 586, 590 (2009). "A statement is

voluntary if it is 'the product of an essentially free and unconstrained choice by its maker.'" United States v. Daye, No. 16-CR-0088-LRR, 2017 WL 499681, at *4 (N.D. Iowa Feb. 7, 2017) (quoting Schneckloth v. Bustamonte, 412 U.S. 218, 225 (1973)). "A statement is involuntary when it [is] extracted by threats, violence or express or implied promises sufficient to overbear the [suspect's] will and critically impair his capacity for self-determination." United States v. LeBrun, 363 F.3d 715, 724 (8th Cir. 2004) (internal quotation marks and citation omitted).

> Whether a confession is the involuntary product of coercion is judged by the totality of the circumstances—including an examination of both the conduct of the officers and the characteristics of the accused. The Supreme Court has long indicated that one of the key concerns in judging whether confessions were involuntary, or the product of coercion, was the intelligence, mental state, or any other factors possessed by the defendant that might make him particularly suggestible, and susceptible to having his will overborne.

Wilson v. Lawrence Cty., 260 F.3d 946, 952 (8th Cir. 2001) (citations omitted); see also Moran v. Burbine, 475 U.S. 412, 421 (1986) ("Only if the 'totality of the circumstances surrounding the interrogation' reveal both an uncoerced choice and the requisite level of comprehension may a court properly conclude that the Miranda rights have been waived."). "Coercive official activity is a necessary predicate to a finding that a statement is not voluntary. The [F]ifth [A]mendment privilege against self-incrimination is not concerned with other types of psychological pressures. An incriminating statement is not involuntary unless extorted from the accused by means of coercive activity." United States v. Goudreau, 854 F.2d 1097, 1099 (8th Cir. 1988) (citation omitted).

As in determining waiver of Miranda rights, the government likewise bears the burden to show voluntariness of a confession: "[W]hen a confession challenged as involuntary is sought to be used against a criminal defendant at his trial, he is entitled to

a reliable and clear-cut determination that the confession was in fact voluntarily rendered. Thus, the prosecution must prove at least by a preponderance of the evidence that the confession was voluntary." <u>Lego v. Twomey</u>, 404 U.S. 477, 489 (1972). The Supreme Court has made clear the consequences of conviction on the basis of an involuntary confession: "[A] defendant in a criminal case is deprived of due process of law if his conviction is founded, in whole or in part, upon an involuntary confession, without regard for the truth of falsity of the confession and even though there is ample evidence aside from the confession to support the conviction." <u>Jackson v. Denno</u>, 378 U.S. 368, 376 (1964).

"If an individual's 'will was overborne' or if his confession was not 'the product of a rational intellect and a free will,' his confession is inadmissible because coerced. These standards are applicable whether a confession is the product of physical intimidation or psychological pressure." <u>Townsend v. Sain</u>, 372 U.S. 293, 307 (1963), <u>overruled in part on other grounds by</u> <u>Keeney v. Tamayo-Reyes</u>, 504 U.S. 1, 5-6 (1992) (citations and footnotes omitted). In <u>LeBrun</u>, 363 F.3d at 725-26, the Eighth Circuit cited to a number of cases in which the court concluded a defendant's confession was voluntary considering the totality of the circumstances: a defendant's mistaken belief that officers promised leniency in exchange for his confession, <u>United States v. Kilgore</u>, 58 F.3d 350, 353 (8th Cir 1995); officers encouraging a defendant to talk even though the knew of the defendant's erroneous belief that an accidental shooting would negate an element of a murder charge, <u>Winfrey v. Wyrick</u>, 836 F.2d 406, 411-412 (8th Cir. 1987); a confession to a felony induced by a promise that the defendant would not be prosecuted for a separate offense involving a drive-by shooting, <u>United States v. Larry</u>, 126 F.3d 1077,

1079 (8th Cir. 1997); and a confession by a defendant of average intelligence who had prior contact with law enforcement, United States v. Gallardo-Marquez, 253 F.3d 1121, 1123-24 (8th Cir. 2001).

At the suppression hearing, Ceron asserted him giving a voluntary statement, without any conditions, would be inconsistent with his history of non-cooperation with law enforcement on prior criminal charges, inconsistent with him strenuously contesting extradition in the Panamanian courts, and inconsistent with the vigorous defense he has mounted since his January 2017 transfer to custody of the United States. In his first pro se motion, Ceron similarly asserted it would have been illogical for him to make a voluntary statement. (Doc. 93, pp. 3-4). Agents Buemi and Black testified that it was not until after they presented Ceron with evidence implicating his mother and Um that he began to cooperate in the interrogation. Ceron asserts the fact he did not begin to cooperate until the agents talked about evidence against his mother and his girlfriend shows his statements were coerced by the threat of harm to his mother and to Um.

Ceron asserts the government's failure to preserve certain evidence supports his position. Agent Black testified his interview notes existed at the time he prepared his report but that he can no longer find the notes. And it appears to be a common practice that records of agents' text messages and cell phone calls are not preserved when cell phones are replaced. Additionally, the agents acknowledged on cross-examination that there was no prohibition on taking photos during the interrogation in Panama. Photos could help to confirm the description of the interrogation room and to confirm the presence or absence of firearms.

There is no dispute that Ceron inquired about having a lawyer when the Advice of

22

Rights forms were presented to him. But nowhere in his sworn statement does he state that he actually requested a lawyer or that he stated he wanted to speak with a lawyer before answering questions.

There are inconsistencies in the evidence concerning the time of the Ceron/Um phone call. Corporal Turcot testified the call was made shortly after 5:00 p.m., Eastern Time, but according to testimony of Agents Black and Buemi, the call began at least an hour after 2:50 p.m. (the time at which the interrogation of Ceron began) or approximately 3:50 p.m. The partial translated transcript lists a time of 2:05 p.m. And it appears only a portion of the phone call was recorded, since the transcript does not appear to include all of the statements of Corporal Turcot. The discrepancies in timing may be related to time zone differences. The court's research shows Panama does not observe Daylight Savings Time. Timeanddate.com, https://www.timeanddate.com/worldclock/panama (last visited May 17, 2019).

Agent Black's testimony was consistent with the contents of his report, which he prepared within seven days after the interrogation. The testimony among the four agents is largely consistent, and each was subject to cross-examination. Ceron does not counter the agents' testimony that Panamanian authorities did not allow the agents to carry firearms while in Panama. Ceron presents no law countering the government's position that recording of the interrogation was prohibited by Panama's constitution.

In his pro se motion, Ceron states that he had no way of knowing whether Panama allowed recording and that he thought the interrogation was being recorded:

> Again I could not have made up the hostage threat against my family, unless they actually said it, because, I see smart phones, I don't know if Panama doesn't allow interrogations to be recorded, that's very exclusive

> intel, I can't know that! Say such [a] thing and it not be [the] truth after having give any type of statement and then pull back, with reason of the accusation I bring forward, will be stupid from me and counterproductive if I was looking for a deal then.
>
> That will be as easy as to government say, here are recordings and make me look like a liar right at the start.

(Doc. 93, p. 3) (spelling, punctuation, and capitalization altered).

In Ceron's view, the implication of adverse consequences to his family was psychological pressure sufficient to overbear his will and coerce his confession and to elicit his cooperation. However,

> "The mere fact that an officer may have elicited a confession through a variety of tactics, including . . . playing on a suspect's emotions, using his respect for his family against him, deceiving the suspect, conveying sympathy, and even using raised voices, does not render a confession involuntary unless the overall impact of the interrogation caused the defendant's will to be overborne."

United States v. Boslau, 632 F.3d 422, 428 (8th Cir. 2011) (internal citations and quotation marks omitted); see also Wilson v. Lawrence Cty., 260 F.3d 946, 952 (8th Cir. 2001) ("Whether a confession is the involuntary product of coercion is judged by the totality of the circumstances—including an examination of both the conduct of the officers and the characteristics of the accused."). Although Ceron doubtlessly perceived some level of pressure from the coordinated interrogations, the other attendant facts comprising the totality of the circumstances show his statement was, in fact, voluntary. Though the evidence shows Ceron's cooperation was motivated by his desire to save Um and his mother from criminal charges, based on the evidence of record, none of the law enforcement agents used improper interrogation tactics. See Colorado v. Connelly, 479 U.S. 157, 167 (1986) ("[C]oercive police activity is a necessary predicate to the finding

that a confession is not 'voluntary' within the meaning of the Due Process Clause of the Fourteenth Amendment.") Ceron initialed and signed a Spanish language Advice of Rights form, and apart from questions about the process for obtaining a lawyer, there is no evidence he asked any questions about his rights. The agents' testimony is more credible than is Ceron's written statement.

1.      **Pro Se Motions**

In his first pro se motion, Ceron asks for a "list of people who knew or had reason to know or find out about what I claim happened, and specific evidence, as certain call logs, surveillance cameras, and more." (Doc. 93, p. 6). In the second pro se motion, Ceron asks that a total of twenty-four individuals be subpoenaed to give testimony. Eighteeen of the twenty-four are Canadian law enforcement personnel, and Ceron asks that they be subpoenaed in Canada, "via conference, but before a judge." (Doc. 94, p. 2). He also asks that Um be subpoenaed, along with two individuals who were charged in related cases in this court, a Panamanian attorney, an American attorney, and an individual named Gilles Denis. Additionally, he asks that certain documents and recordings be subpoenaed: (1) full reports of the CBSA agents who escorted him to TIA, (2) a CBSA "final report on events and deportation," (3) a recording of a "call from me to Marie Um," (4) a recording of the entire interview conducted in Panama, (5) digital notes of "U.S. Embassy present during interrogation," (6) his testimony at court hearings in Panama, (7) July 17, 2015 surveillance footage from a certain gate at the TIA terminal, (8) "lying brain scan detector," and (9) FBI "Full Report on Government Kidnapping." Id. at 2-3. Ceron states he is positive the CBSA reports would confirm his claims of threats against his family. Id. at 1.

Ceron is represented by counsel. When a defendant is represented by counsel, the court has no obligation to consider any motions filed pro se. United States v. Pate, 754 F.3d 550, 553 (8th Cir. 2014). Both motions could be denied on that basis alone.

Ceron's motions refer to his dissatisfaction with counsel not having subpoenaed the evidence and witnesses he identifies. In the event the presiding judge views Ceron's statement of dissatisfaction with counsel as reason to consider the pro se motions, this court discusses the merits of the pro se motions. In a criminal case, information requested in a subpoena must have (i) relevancy, (ii) admissibility, and (iii) specificity. United States v. Nixon, 418 U.S. 683, 700 (1974); see also United States v. R. Enters., Inc., 498 U.S. 292, 296. A subpoena cannot be for a general "fishing expedition" or based on a "mere hope" the desired documents would produce favorable evidence. United States v. Hang, 75 F.3d 1275, 1283-84 (8th Cir. 1996); see also United States v. Bueno, 443 F.3d 1017, 1026 (8th Cir. 2006) ("[A] moving party must show, among other things, that the documents are evidentiary and relevant and that the application is made in good faith and not intended as a general fishing expedition.")

Ceron does not explain the basis for his statement that he is positive the CBSA reports would confirm his claims of threats, and the CBSA agents' emails in evidence directly contradict Ceron's claims. The evidence before the court shows that no recording of the interrogation exists. None of the evidence before the court suggests presence of U.S. Embassy personnel during the interrogation. It does not appear that recordings of the Panamanian court hearings would be relevant to the question of Ceron's statements at TIA being voluntary. As to Ceron's request to subpoena a "lying brain scan detector" and an FBI "Full Report on Government Kidnaping," the intended

meaning of those requests is not clear to this court. As to the call between Ceron and Um, a transcript of a portion of the call is now in evidence, and investigate reports now in evidence refer to Agent Gino recording "a portion of their conversation." (Doc. 90-4, p. 4).

Of the twenty-four witnesses Ceron wishes to subpoena, two are CBSA agents who were present in Panama on July 17, 2015, and their emails demonstrate they have no information about threats made to Ceron. Ceron does not identify any of the other twenty-four witnesses as having been present in Panama on the day of his interrogation.

In this court's opinion, if Ceron's pro se motions were considered on their merits, they should be denied under the standards of <u>Hang</u>. 75 F.3d at 1283-84.

## Conclusion

Ceron's pro se motions could be denied under the Eighth Circuit's <u>Pate</u> decision. If considered on the merits, this court **RECOMMENDS** they be denied under <u>Hang</u>.

Considered in its totality, evidence the government presented at the suppression hearing shows, by a preponderance of the evidence, that Ceron's July 17, 2015 statements were given voluntarily. This court therefore **RECOMMENDS** that Ceron's motion to suppress be **DENIED**.

Dated this 20th day of May, 2019.

/s/ *Alice R. Senechal*
Alice R. Senechal
United States Magistrate Judge

27

## NOTICE OF RIGHT TO OBJECT[5]

Any party may object to this Report and Recommendation by filing with the Clerk of Court, no later than **June 3, 2019**, a pleading specifically identifying those portions of the Report and Recommendation to which objection is made and the basis of any objection. Failure to object or to comply with this procedure may forfeit the right to seek review in the Court of Appeals.

---

[5] See Fed. R. Crim. P. 59(b)(2); D.N.D. Crim. L.R. 59.1(D)(3).